STRASS, Respondent, v. CIVIL SERVICE BOARD
OF CITY OF SIOUX FALLS et al, Appellants
(34 N. W.2d 218.)

(File No. 8987.  Opinion filed October 11, 1948.)

**Roy D. Burns,** of Sioux Falls, for Appellants.

**Louis H. Smith,** of Sioux Falls, for Respondent.

SMITH, J.   The plaintiff Carl T. Strass, a captain of police of the city of Sioux Falls, was suspended from service without pay for a period of ten days by notice in writing which stated, "The reasons for such suspension are that on the 24th day of July, you were guilty of conduct unbecoming a police officer, failure to properly carry out the duties of your position in not making proper investigation of an alleged traffic violation by M. E. Schirmer and acting arbitrarily and with discourtesy to M. E. Schirmer in connection with the handling of such traffic matter."   Captain Strass exercised a privilege provided by the city ordinances and appealed to the Civil Service Board of Sioux Falls.   After hearing the Board found as an ultimate fact "That the appellant, in connection with the alleged parking violation of one M. E. Schirmer, failed to properly carry out the duties of his position as Captain of Police, in not making a proper investigation of such alleged traffic violation, and acted arbitrarily in the disposition of such matter," but modified the period of suspension.   Upon application of Strass the proceedings of the Board were reviewed by the circuit court under a writ of certiorari.   The trial court concluded that the Board had exceeded its jurisdiction in that it had acted without evidence, and in disregard of indisputable proof and accordingly entered judgment annulling the challenged order of suspension.   The Board has appealed.

Pursuant to SDC 45.0201(103) as amended by Chapter 197 of Session Laws of 1945, the city of Sioux Falls adopted a civil service ordinance.   The causes for discharge, suspension or reduction set forth in the ordinance include a failure "to obey any lawful or reasonable direction made and given by his superior officer, where such * * * failure to obey amounts to an act of insubordination or a serious breach of proper discipline" and explicitly provides that the listed causes are not exclusive.   The ordinance sets up a civil service board of three members and provides for an appeal to and hearing before the Board by a person removed or suspended.   The scope of the review by the board is fixed and limited by the ordinance as follows: "The investigation shall be confined to the determination of the question

of whether such removal, suspension, demotion, or discharge was or was not made for political or religious reasons, and was or was not made in good faith for cause." The ordinance further provides that "After such investigation the Board may, if in its estimation the evidence is conclusive, affirm the removal, or if it shall find that the removal, suspension, or demotion was made for political or religious reasons or was not made in good faith for cause, shall order the immediate reinstatment * * * of such person * * *." Provision is also made for modification of the order of removal or suspension by the Board.

Sioux Falls installed parking meters and adopted a parking meter ordinance. For use by its traffic officers in dealing with violations of that and other ordinances, the police department has provided a notice in triplicate, the original of which goes to the violator and the copies to the department and clerk of the municipal court respectively. This notice directs the violator to appear before the clerk of the municipal court within twenty-four hours to answer the violation of the traffic ordinance checked on said notice. Among the violations listed on the ticket for checking is "overtime parking."

A traffic ordinance of the city provides: "A traffic violation shall not be excused or dismissed by any police officer or other officer * * *."

From the testimony the Board was justified in believing, the following facts appear.

The chief of police had instructed Captain Strass, who was an officer of the traffic squad or department, and other members of the department, to listen to complaints of persons holding overtime parking tickets who claimed the meter was out of order, to investigate the circumstances, and to recommend dismissal of the charge if the meter was out of order. According to the practice of the department the recommendation of dismissal is noted on the above described copy of the ticket to be filed in the office of the clerk of municipal court, and based thereon, the motion for dismissal is made to the municipal judge by the assistant city attorney. Captain Strass was familiar with the policy and

practice and had reccomended dismissals in accordance therewith.

On July 22, 1947, M. E. Schirmer parked his car in a space near his office and deposited a coin in the meter. When he returned he found a ticket, or notice to appear as above described, on his windshield. Examination convinced him that the meter had indicated violation before the time allotted by ordinance. He frankly admitted however that his car had been parked longer than the alloted time when he returned. On July 23, 1947, Schirmer parked his car in the same place. He attempted to insert a coin in the meter, but it lodged and failed to activate the mechanism. Being in a hurry he left his car in the space with the meter showing violation, but with the coin visible to any one who would make a careful investigation of the .meter. Thirty-seven minutes thereafter a ticket was attached to his windshield for overtime parking. Forty-five minutes after he left his car, and within the time allotted for parking, he returned and found the notice to appear for overtime parking. He found an officer by name of Bouldin in the vicinity and showed him that the meter was not working. In Schirmer's presence, Bouldin called the department and gave notice of the condition of the meter. At Bouldin's request, Schirmer left both above described traffic tickets with him to permit Bouldin to consult the officer who had issued them. The issuing officer advised Bouldin that Schirmer would have to see his superior, Captain Strass. The tickets were left at Schirmer's office the next morning with a message directing him to see Captain Strass.

The conference with Strass is described in the testimony of Schirmer as follows: "Well I approached the desk and I said, 'good morning Captain' and he looked over ·the newspaper and I said, 'I have a parking ticket I would like to talk about' and I handed the ticket through the window and he took the ticket and he says, 'do you see the top of that ticket, it says, pay to the Clerk of the Municipal Court' and I said, 'Captain that is unfair that meter was not working' and he repeated, 'do you see the top of that ticket, it says, pay· to the Clerk of Municipal Court.' And I said

Captain one patrolman checked that meter and it was not working and he said, 'Yes I know Henry Bouldin took the ticket and he had no damn right to do that.' He said if I didn't want to pay the ticket I could stand trial before the Municipal Court or words to that effect."

Captain Strass testified: "I picked them up, the tickets and looked at them and asked this party what he wanted me to with them and he says Bouldin had instructed him to come and see Captain Strass and he asked me if I was Captain Strass and I told him I was and he said he was guilty of one of the tickets and I said, 'that ticket goes to the Clerk of Courts' and then he had this other ticket and he said he didn't think he was guilty on it and I said, 'if you are guilty on one you might as well take the other one along to the Clerk of Courts.' There was no cussing or swearing on either side, it was all in mild tones. * * * The last thing I said was 'take the ticket to the Clerk of Courts because I couldn't dismiss it.' ".

The following questions and answers appear in the cross-examination of Strass:

"Q. And when Mr. Schirmer tried to tell you you wouldn't listen would you? A. He admitted that he was guilty on one and if he was guilty on one I figured guilty on the other.

"Q. If I was guilty for leaving my car overparked in the meter zone, guilty twice for that and came in the third time and the third time because of a parking meter failure you think you shouldn't listen to my story? A. Probably should.

"Q. Why didn't you listen to Schirmer? A. The only thing don't want to argue with them and when we listen every time we get into an argument.

"Q. You knew when you pointed to the statement on the parking meter ticket, to be sent to the Municipal Court, you knew that wasn't the practice in cases of good grounds for dismissal? A. I had taken it up with the Chief of Police and his advice was to have them take them to the Clerk of Courts.

"Q. Didn't take it up with the Assistant Chief of Police that two of these tickets were issued in case of parking meter failures? Lee didn't know that did he? A. No I don't think he did. * * *

"Q. When Schirmer appeared before you you didn't know that the second ticket was issued in case where the parking meter failed did you? A. Well no I didn't. He just pleaded guilty to one ticket and wanted to know what to do with the other.

"Q. Did you or didn't you know that he was claiming parking meter failure on the July 23rd ticket, you didn't know that did you? A. No I didn't.

"Q. Except that he did tell you that? A. No he didn't tell me, he wanted the ticket excused he figured it was unfair that he got two tickets.

"Q. Didn't he say why it was unfair? A. Well no.

"Q. You didn't give him a chance to say? A. He was there two or three minutes."

On recross-examination Strass answered questions as follows:

"Q. Did Schirmer get a chance to tell you about this, that the meter had failed on July 23? A. That is what he said he didn't figure that he was guilty of the second ticket because the meter was wrong. * * *

"Q. When Schirmer claimed this why didn't you investigate to see if there was a failure? A. I already knew, the man that makes the rounds, the repairman reported that he had fixed it.

"Q. You knew when Schirmer came in you knew the meter failed? A. No not until the next day in Court I didn't know."

Immediately following this conference, Schirmer appeared at the Clerk's office and paid a fine on each of his two tickets. Thereupon he went to the chambers of the Judge of Municipal Court and told his story. As a result of his complaint to the Judge, his fine on the ticket of the 23rd was repaid, and he stood trial on that charge in municipal court the following morning. After trial the Judge found not guilty. Thereafter the Judge complained to Strass' su-

periors of his handling of Schirmer. The suspension resulted.

The civil service ordinance was adopted in the public interest to safeguard municipal employees from the spoils system and from religious prejudice. We find nothing therein which seeks to hamper the city's administrative officers in commanding ready, willing, and efficient cooperation form all of its employees in carrying out such policies as they in good faith adopt in the public interest. The chief of police, because of some difficulty with parking meters, in good faith adopted and announced a policy in dealing with persons charged with overtime parking who should claim the meter was out of order. He instructed Captain Strass and others to listen to the complaints of such persons, and, if on investigation it appeared that the meter had failed to operate, to recommend a dismissal of the charge. That such a policy was in fact in the public interest is obvious. It is equally plain that it does not trench on the ordinance which proscribes dismissal of traffic tickets by police officers. It but looks toward a just and proper dismissal by the municipal court.

It cannot reasonably be claimed that Captain Strass gave ear to Schirmer's complaint or that he investigated to ascertain whether the meter had in fact failed. He arbitrarily concluded that if Schirmer was guilty in the one instance, he was guilty of the other and in effect told him to go and pay up or stand trial. He did not recommend the dismissal the Judge so readily granted after ascertaining the facts. Plainly, in this instance, Strass neither conformed to the letter nor the spirit of the policy promulgated by his chief.

A labored effort was made at the hearing to justify the conduct of Strass by attempting to show he was acting under special instructions from his superior in dealing with these particular traffic tickets. It was established that after Bouldin had taken these tickets into his possession a member of the force reported that fact to Strass and indicated Bouldin was attempting something wrongful. Strass relayed this report to the assistant chief and in substance was

directed to make a further investigation. Thereafter Schirmer appeared with the tickets in his possession and the conference described in the quoted testimony supra took place. After the event, Strass reported he had sent Schirmer to municipal court and the assistant chief indicated approval. It is undisputed that the assistant chief was never informed that Schirmer was complaining of meter failure, and the sole matter under consideration between Strass and his superior was the conduct of Bouldin. The Board was justified in concluding that in dealing with Mr. Schirmer Strass did not believe he had been instructed to deviate from the fixed policy of the department dealing with complaints of meter failure by holders of overtime parking tickets, and that the contention of·justification was not sustained by the evidence.

The administrative heads of the police department concluded that disciplinary measures were indicated and determined upon a period of suspension without pay. As pointed out above, the sole jurisdiction of the Civil Service Board on appeal from that decision was to determine whether such suspension "was or was not for political or religious reasons, and was or was not made in good faith for cause." Captain Strass did not attempt to establish at the hearing that the mayor and assistant chief had acted for political or religious reasons, or that they had acted in bad faith. The sole issue presented before the Board was whether cause for the suspension existed. As we have indicated, a cause for discipline was established by evidence which stands undisputed. It necessarily follows the trial court erred in finding and concluding that the Board acted without evidence. And painstaking analysis of the record fails to reveal any pertinent undisputed evidence the Board disregarded. Therefore, its judgment is reversed.

All the Judges concur.